Filed 10/13/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| T-MOBILE WEST LLC et al.,<br><br>       Plaintiffs and Appellants,<br><br>v.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>       Defendants and Respondents. | A144252<br><br>(San Francisco City and County Super. Ct. No. CGC-11-510703)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**THE COURT:**[*]

IT IS ORDERED that the opinion filed on September 15, 2016, is modified as follows and appellants' petition for rehearing is DENIED:

1.  On page 2, the second full sentence on the page is deleted and replaced with the following sentence:

> In 2011, the City and County of San Francisco (City) enacted an ordinance requiring all persons to obtain a site-specific permit before seeking to construct, install, or maintain certain telecommunications equipment, known as "Personal Wireless Service Facilities" (hereafter wireless facilities), in the public right-of-way.

2.  On page 2, at the conclusion of the new second sentence mentioned above, a new footnote is added (with all following footnotes renumbered accordingly) that reads:

> Under the City's ordinance, wireless facilities are antennas and related facilities used to provide or facilitate the provision of "Personal Wireless Service," which is defined as commercial mobile services provided under a license issued by the Federal Communications Commission.

---

[*] Before Simons, Acting P.J., Needham, J., and Bruiniers, J.

1

3. On page 4, in part I, a new final sentence is added to the first partial paragraph that reads:

> The Ordinance also prohibits issuance of a Wireless Permit if the applicant seeks to "[i]nstall a new Utility or Street Light Pole on a Public Right-of-Way where there presently are no overhead utility facilities."

4. On page 9, in part II, at the conclusion of the first partial paragraph and following the citation to *Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267, a new footnote is added (with all following footnotes renumbered accordingly) that reads:

> In a petition for rehearing, Plaintiffs insist the correct standard requires them " 'to show the statute is unconstitutional in all or most cases.' " (*City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1504.) "The precise standard governing facial challenges 'has been a subject of controversy within [the California Supreme Court].' " (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 39.) "Under the strictest test, the statute must be upheld unless the party establishes the statute ' "inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions." ' [Citation.] Under the more lenient standard, a party must establish the statute conflicts with constitutional principles ' "in the generality or great majority of cases." ' [Citation.] *Under either test, the plaintiff has a heavy burden to show the statute is unconstitutional in all or most cases, and ' "cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute." ' "* (*Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1145, italics added; accord, *Boggess*, at p. 1504.) In suggesting we are compelled to apply a more lenient standard, Plaintiffs misplace their reliance on facial challenges involving First Amendment and abortion rights. (See, e.g., *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 342–343, 347 (plur. opn. of George, C.J.).)

5. On page 22, in part II.A., in the first complete paragraph, at the conclusion of the second sentence, a new footnote is added that reads:

> Plaintiffs claim this hypothetical assumes facts that are not possible under the Ordinance because all utilities are underground at the former locations. The Ordinance provides: "The Department shall not issue a [wireless permit] if the Applicant seeks to: [¶] (1) Install a new Utility or Street Light Pole on a Public Right-of-Way where there presently are no overhead utility facilities." However, Plaintiffs simply ask us to assume there are no overhead utility facilities near Coit Tower or the Painted Ladies. Even if we can assume as much, the Ordinance's

ban on new utility poles is itself a challenged, but seemingly reasonable, aesthetic restriction. By referencing Coit Tower and the Painted Ladies, we do not mean to suggest these are the only areas of aesthetic value where installation of a wireless facility could incommode public use. We merely seek to illustrate why a facial challenge is inappropriate. We decline Plaintiffs' invitation to assume the Ordinance's aesthetic restrictions will only affect proposed installation of wireless facilities on existing utility poles that are already cluttered with other electrical and telecommunications equipment.

6. On page 23, in part II.B., the final sentence of the last complete paragraph is deleted and replaced with the following sentence:

Under the City's interpretation, subdivision (b) of section 7901.1 has no application to the Ordinance because it is not a regulation of "time, place, and manner of *construction*—but is instead a regulation that permits Wireless Facilities to be installed in the public right-of-way subject to certain siting criteria." (Italics added.)

7. On page 23, in part II.B., the first two sentences of the final partial paragraph are deleted and replaced with the following:

Plaintiffs, in their opening brief, contend section 7901.1 defines the limited authority local governments have under section 7901. In their view, sections 7901 and 7901.1 give local governments limited construction management authority, but only to prevent physical obstruction of the roads, not aesthetic incommodation. In the alternative, they contend that, even if the City has the authority to impose discretionary aesthetic regulation, the City's application of such control must be equivalent for "all entities." (See § 7901.1, subd. (b).) In their reply brief and a petition for rehearing, Plaintiffs refine their position and contend that section 7901.1 does not relate solely to temporary construction access to the right-of-way. However, Plaintiffs continue to maintain that section 7901.1 "does not expand [local government] authority," but defines the limited authority section 7901 reserved for local governments to regulate how the public right-of-way is accessed *and* occupied.

8. On page 25, in part II.B., immediately after the final full sentence on the page, insert a new footnote that reads:

In their petition for rehearing, Plaintiffs argue for the first time that the Ordinance regulates temporary construction activities. We are not required to address this forfeited argument. (See *People v. Holford* (2012) 203 Cal.App.4th 155, 159, fn. 2 ["it is 'too late to urge a point for the first time in a petition for rehearing, after the case ha[s] been fully considered and decided by the court upon the points

3

presented in the original briefs' "].)  Suffice it to say, Plaintiffs have not met their burden to show the challenged portions of the Ordinance require anything different of them, as compared to AT&T, Comcast, or PG&E, with respect to temporary access to the right-of-way for construction purposes.

The modification effects no change in the judgment.


Date_____          _____ Acting P.J.

4

Superior Court of the City and County of San Francisco, No. CGC-11-510703, James McBride, Judge.

Davis Wright Tremaine, Martin L. Fineman, T. Scott Thompson and Daniel P. Reing for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Yvonne R. Meré, Chief of Complex and Affirmative Litigation, William K. Sanders and Erin B. Bernstein, Deputy City Attorneys, for Defendants and Respondents.

Rutan & Tucker, Jeffrey T. Melching and Ajit Singh Thind for League of California Cities, California State Association of Counties and SCAN NATOA, Inc. as Amici Curiae on behalf of Defendants and Respondents.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| T-MOBILE WEST LLC et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN<br>FRANCISCO et al.,<br><br>     Defendants and Respondents. | A144252<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-11-510703) |

     Sometimes tension exists between technological advancement and community aesthetics. (*Sprint PCS Assets v. City of Palos Verdes Estates* (9th Cir. 2009) 583 F.3d 716, 720 (*Palos Verdes Estates*).) We address here the scope of local government authority to adjust the balance of those interests, consistent with state-wide regulation.

     Telephone and telegraph companies have long exercised a franchise under state law to construct and maintain their lines on public roads and highways "in such manner and at such points as not to incommode the public use." (Pub. Util. Code, § 7901;[1] *Pac. Tel. & Tel. Co. v. City & County of S. F.* (1959) 51 Cal.2d 766, 771 (*Pacific Telephone I*).) State law also provides that local government maintains the right "to exercise reasonable control as to the time, place, and manner in which roads, highways,

---

[1] Undesignated statutory references are to the Public Utilities Code. Section 7901 provides: "Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters."

and waterways are accessed. [¶] . . . The control, to be reasonable, shall, at a minimum, be applied to all entities in an equivalent manner." (§ 7901.1, subds. (a), (b).) In 2011, the City and County of San Francisco (City) enacted an ordinance requiring all persons to obtain a site-specific permit before seeking to construct, install, or maintain certain telecommunications equipment, known as "Personal Wireless Service Facilities" (hereafter wireless facilities), on existing poles in the public right-of-way. In this appeal, we consider whether the ordinance, on its face, is preempted by sections 7901 and 7901.1. We affirm the trial court's determination that portions of the ordinance that authorize consideration of aesthetics are not preempted by state law.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

T-Mobile West LLC, Crown Castle NG West LLC,[2] and ExteNet Systems (California) LLC (collectively Plaintiffs) are considered "telephone corporations" under California law. (§ 234.) Plaintiffs' business requires installation and operation of wireless facilities, including antennas, transmitters, and power supplies, on existing utility poles in the City's public rights-of-way. These wireless facilities are considered "telephone lines." (§ 233.)

In January 2011, the San Francisco Board of Supervisors adopted Ordinance No. 12-11 (Wireless Ordinance or Ordinance), which required Plaintiffs to obtain a wireless facility site permit (Wireless Permit) from the City's Department of Public Works (DPW) before installing or modifying any wireless facility in the public right-of-way.[3] In adopting the Ordinance, the Board of Supervisors observed:

"(1) Surrounded by water on three sides, San Francisco is widely recognized to be one of the world's most beautiful cities. Scenic vistas and views throughout San

---

[2] Crown Castle NG West LLC has also appeared in this litigation as Crown Castle NG West Inc. and NextG Networks of California, Inc.

[3] The Wireless Ordinance was codified as Article 25 of the San Francisco Public Works Code.

2

Francisco of both natural settings and human-made structures contribute to its great beauty.

"(2) The City's beauty is vital to the City's tourist industry and is an important reason for businesses to locate in the City and for residents to live here. Beautiful views enhance property values and increase the City's tax base. The City's economy, as well as the health and well-being of all who visit, work or live in the City, depends in part on maintaining the City's beauty.

"(3) The types of wireless antennas and other associated equipment that telecommunications providers install in the public rights-of-way can vary considerably in size and appearance. The City does not intend to regulate the technologies used to provide personal wireless services. However, *the City needs to regulate placement of such facilities in order to prevent telecommunications providers from installing wireless antennas and associated equipment in the City's public rights-of-way either in manners or in locations that will diminish the City's beauty*." (Italics added.) After the Ordinance was enacted, DPW adopted implementing regulations.

The Ordinance required a showing of technological or economic necessity for permit approval and created three "Tiers" of facilities based on equipment size. Tier I was defined to include only the smallest equipment (essentially, primary and secondary equipment enclosures, each less than 3 cubic feet in volume and no greater than 12 inches wide and 10 inches deep). Tier II was defined to allow equipment slightly larger in overall volume than Tier I (4 cubic feet), but with the same limits on width and depth. Tier·III was defined as any equipment larger than Tier II. The Ordinance conditioned approval of permits for equipment in Tiers II and III on aesthetic approval by a City department responsible for the proposed site.

Within Tiers II and III, three additional subdivisions were created, depending on whether the proposed wireless facility was in a location designated as (1) unprotected,

3

(2) "Planning Protected" or "Zoning Protected," or (3) "Park Protected."[4]  Each of those subdivisions, in turn, triggered different aesthetic standards for approval.  For example, if a wireless facility was proposed to be installed near a historic building or in a historic district, the City's Planning Department needed to determine that it would not "significantly degrade the aesthetic attributes that were the basis for the special designation" of the building or district.  Additionally, for any Tier III facility, a "necessity" standard required DPW to find that "a Tier II Facility is insufficient to meet the Applicant's service needs."  DPW would not issue a Wireless Permit unless the relevant City department determined the proposed wireless facility "satisfie[d]" the applicable aesthetic compatibility standard.

If DPW approved a Tier III application after recommendation by the Planning Department, the approval from DPW was only "tentative," and the applicant was then required to notice the public.  "Any person" could protest tentative approval of a Tier III application within 20 days of the date the notice was mailed and then subjected the application to public hearing.  After a final determination on a Tier III application, "any person" could appeal to the Board of Appeals.

On May 3, 2011, Plaintiffs filed an action for declaratory and injunctive relief.  The operative second amended complaint asserted five causes of action:  (1) violation of Government Code section 65964, subdivision (b);[5] (2) an unlawful taking of Plaintiffs'

---

[4] A "Planning Protected" location generally involves proposed locations adjacent to national historic landmarks or that the City has designated as having views rated as "good" or "excellent."  A "Zoning Protected" location is "within a Residential or Neighborhood Commercial zoning district under the San Francisco Planning Code."  A "Park Protected" location is adjacent to a City park or open space.

[5] Government Code section 65964 provides:  "As a condition of approval of an application for a permit for construction or reconstruction for a development project for a wireless telecommunications facility, as defined in Section 65850.6, a city or county shall not do any of the following: [¶] (a) Require an escrow deposit for removal of a wireless telecommunications facility or any component thereof.  However, a performance bond or other surety or another form of security may be required, so long as the amount of the bond security is rationally related to the cost of removal.  In establishing the amount of

4

property without due process of law; (3) violation of and preemption by sections 7901 and 7901.1; (4) preemption of DPW regulations granting the Planning Department review authority under the California Environmental Quality Act; and (5) violation of and preemption by the then-newly enacted section 6409 of the Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. § 1455). Plaintiffs' first and fourth causes of action were resolved by summary adjudication. Plaintiffs voluntarily dismissed their second cause of action before trial.

During the bench trial on the remaining third and fifth causes of action, Plaintiffs and the City stipulated that Comcast, AT&T, and PG&E have also installed certain equipment, including backup battery units, antennas, cut-off switches, power meters, and transformers, on utility poles in the City's public right-of-way. With respect to PG&E, it was stipulated the City granted PG&E a franchise to install its facilities in the public right-of-way and requires it to obtain temporary occupancy permits if the installation will take more than one day. The parties also stipulated that telephone corporations installing facilities on utility poles other than wireless facilities, such as AT&T, and state video providers, such as Comcast, need only obtain utility conditions permits and temporary occupancy permits if the installation will take more than one day. Comcast, AT&T, and PG&E are not required to obtain any site-specific permit as a condition of installing such facilities on existing utility poles.[6]

---

the security, the city or county shall take into consideration information provided by the permit applicant regarding the cost of removal. [¶] (b) Unreasonably limit the duration of any permit for a wireless telecommunications facility. Limits of less than 10 years are presumed to be unreasonable absent public safety reasons or substantial land use reasons. However, cities and counties may establish a build-out period for a site. [¶] (c) Require that all wireless telecommunications facilities be limited to sites owned by particular parties within the jurisdiction of the city or county."

[6] AT&T also installs "surface-mounted" facilities in the public right-of-way. By separate ordinance, the City requires AT&T to publicly notice its intent to install such a facility at a particular location, allows protests to be filed, and requires a hearing if protests are filed.

Following posttrial briefing and argument, the trial court issued its proposed statement of decision, to which both parties objected. On November 26, 2014, the trial court overruled the objections, issued its final statement of decision, and entered final judgment. The court ruled in favor of Plaintiffs on their fifth cause of action, holding that modification provisions of the Ordinance and DPW regulations violate section 6409 of the Middle Class Tax Relief and Job Creation Act. With respect to Plaintiffs' third cause of action, the trial court found portions of the Ordinance, conditioning issuance of a permit on economic or technological necessity, were preempted by section 7901. However, the court held the Ordinance's aesthetics-based compatibility standards were not preempted by sections 7901 or 7901.1.

In concluding that sections 7901 and 7901.1 did not impliedly preempt the City's power to impose aesthetic conditions, the court rejected Plaintiffs' argument that the public right-of-way is incommoded only by physical obstruction of travel. The court concluded *Palos Verdes Estates, supra,* 583 F.3d 716 "correctly viewed the public's right to the 'use of the road' as encompassing far more than merely getting from place to place." The trial court also agreed with the *Palos Verdes Estates* court that "the passage of [section] 7901.1 in 1995 codified and bolstered the right of local government to control and regulate construction of telecommunications facilities and for that reason . . . the Wireless Ordinance is not pre-empted by [section] 7901.1."

The trial court found Plaintiffs' equipment and facilities installed in the public rights-of-way to be "generally similar in size and appearance" to equipment installed by "landline" telephone corporations, cable television operators, and PG&E. Nonetheless, the trial court also rejected Plaintiffs' "secondary argument" that the Ordinance directly conflicts with the equivalence requirement found in section 7901.1, subdivision (b). The court agreed Plaintiffs had failed to sustain their burden of proving the Ordinance was invalid on its face because of this lack of equivalency. The court further explained: "[T]urning to the merits of Plaintiffs' contention[,] the Court agrees that the term all entities means just that and is not limited to telephone and telegraph corporations. However, Plaintiffs have failed to provide reasoning or authority that justifies a finding

6

that [section] 7901.1 requires that all entities, whatever or whoever they may be, must be subject to regulation under the Wireless Ordinance or something similar."

Plaintiffs filed a timely notice of appeal from the judgment.[7] After Plaintiffs filed their notice of appeal, the Board of Supervisors adopted Ordinance No. 18-15 (the Amended Ordinance) in order to comply with the trial court's judgment.[8] In relevant part, the Amended Ordinance retains the same basic permitting structure, but simplifies the standards applicable to proposed wireless facilities by removing the size-based tiers. (See S.F. Public Works Code, §§ 1502–1503.) The Amended Ordinance continues to require compliance with aesthetics-based compatibility standards, but the applicable standard is now determined solely by the location of the facility. (See *id.*, §§ 1502, 1508–1510.) All wireless facilities are now subject to the public notice and protest provisions formerly only applicable to Tier III facilities. (See *id.*, §§ 1512–1513.)[9]

## II.    DISCUSSION

The question on appeal is whether the Ordinance, on its face, conflicts with and is preempted by sections 7901 and 7901.1. Plaintiffs contend the Legislature preempted local regulation by giving Plaintiffs the right to install telephone lines in the public right-of-way "in such manner and at such points *as not to incommode the public use of the*

---

[7] The City filed a cross appeal, which was voluntarily dismissed.

[8] On December 10, 2015, the City asked us to take judicial notice of, among other things, the Amended Ordinance. We deferred ruling on the unopposed request and now grant it with respect to the Amended Ordinance, its implementing regulations, and dictionary definitions of "incommode." (Evid. Code, §§ 451, subd. (e), 452, subds. (b), (h), 459; *Dailey v. City of San Diego* (2013) 223 Cal.App.4th 237, 244, fn. 1 ["we may take judicial notice of postjudgment legislative changes that are relevant to an appeal"].) In all other respects, the request is denied because the documents the City asks us to notice are irrelevant.

[9] Intervening legislative amendments may moot an appeal (*Callie v. Board of Supervisors* (1969) 1 Cal.App.3d 13, 18), but it is undisputed that the Amended Ordinance reenacted aesthetic conditions for issuance of a Wireless Permit. The differences between the 2011 Wireless Ordinance and the Amended Ordinance are irrelevant to our analysis, and we refer to them interchangeably as the Ordinance.

7

*road* or highway or interrupt the navigation of the waters." (§ 7901, italics added.) Plaintiffs also argue the Ordinance violates the "equivalent treatment" requirement of section 7901.1, subdivision (b), because only wireless providers are required to obtain site-specific permits to install their equipment within the right-of-way. The City, on the other hand, maintains the Ordinance is not preempted by either section 7901 or section 7901.1.[10] Specifically, the City insists the plain meaning of the term "incommode" is broad enough "to be inclusive of concerns related to the appearance of a facility" and section 7901.1, subdivision (b), does not apply to the Ordinance. We agree with the City on both points.

We review questions of statutory interpretation and preemption de novo. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10; *Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 69.) " '[T]he construction of statutes and the ascertainment of legislative intent are purely questions of law. This court is not limited by the interpretation of the statute made by the trial court . . . .' " (*Bravo Vending v. City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 391–392.)

"Facial challenges consider only the text of a measure, not the application of the measure to particular circumstances." (*San Diego Gas & Electric Co. v. City of Carlsbad* (1998) 64 Cal.App.4th 785, 803; accord, *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) "Facial challenges to legislation are the most difficult to successfully pursue because the challenger must demonstrate that ' " 'no set of circumstances exists under which the [law] would be valid.' " [Citation.]' [Citation.] Thus, the moving party must establish that the challenged legislation inevitably is in total, fatal conflict with applicable prohibitions." (*Sierra Club v. Napa County Bd. of Supervisors* (2012) 205 Cal.App.4th 162, 173.) "[O]ur task is to determine whether the statute can constitutionally be applied. 'To support a determination of facial unconstitutionality,

_____

[10] The League of California Cities, the California State Association of Counties, and SCAN NATOA, Inc. (the States of California and Nevada Chapter of the National Association of Telecommunications Officers and Advisors) filed an amicus curiae brief in support of the City's position.

8

voiding the statute as a whole, [plaintiffs] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . .  Rather, [plaintiffs] must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267.)

Preemption analysis "consists of four questions, which in order of increasing difficulty may be listed as follows:  (1) Does the ordinance duplicate any state law?  (2) Does the ordinance contradict any state law?  (3) Does the ordinance enter into a field of regulation which the state has expressly reserved to itself?  (4) Does the ordinance enter into a field of regulation from which the state has implicitly excluded all other regulatory authority?" (*Bravo Vending v. City of Rancho Mirage, supra*, 16 Cal.App.4th at p. 397.)  " '[A]bsent a clear indication of preemptive intent from the Legislature,' we presume that local regulation 'in an area over which [the local government] traditionally has exercised control' is not preempted by state law.  [Citation.]  'The party claiming that general state law preempts a local ordinance has the burden of demonstrating preemption.' " (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1242; *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1149.)

"A local ordinance *duplicates* state law when it is 'coextensive' with state law. [Citation.] [¶] A local ordinance *contradicts* state law when it is inimical to or cannot be reconciled with state law.  [Citation.] [¶] A local ordinance *enters a field fully occupied* by state law in either of two situations—when the Legislature 'expressly manifest[s]' its intent to occupy the legal area or when the Legislature 'impliedly' occupies the field. [Citations.] [¶] When the Legislature has not expressly stated its intent to occupy an area of law, we look to whether it has *impliedly* done so.  This occurs in three situations: when ' "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate

9

clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the" locality.' " (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1067–1068.)

A.     *Implied Preemption by Sections 7901 and 7901.1*

Plaintiffs raise several discrete arguments for reversal.  First, Plaintiffs urge section 7901 gave them a right to construct and maintain their facilities in public rights-of-way throughout the state "without further discretionary approval by local governments."  They do not claim "the City lacks all authority to regulate the telephone corporations' exercise of their [s]ection 7901 rights, rather Plaintiffs argue that the Wireless Ordinance is an act in excess of the limited [ministerial] authority the Legislature reserved to the City."  In the alternative, Plaintiffs argue that section 7901's plain language indicates the Legislature impliedly sought to prohibit *any* local government regulation of aesthetics.

Plaintiffs' first argument appears to be premised on the mistaken understanding that local government has no authority to regulate Plaintiffs' installations unless specifically authorized to do so by statute.  The relevant question is not, as Plaintiffs posit, whether section 7901 or section 7901.1 "grants" the City discretionary regulatory power or the power to consider aesthetics.  The question is really whether either section *divests* the City of its constitutional powers.  Our review of the California Constitution, statutory provisions, and the relevant case law lead us to believe section 7901 is a limited grant of rights to telephone corporations, with a reservation of local police power that is broad enough to allow discretionary aesthetics-based regulation.

The California Constitution provides:  "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.)  "Often referred to as the 'police power,' this constitutional authority of counties or cities to adopt local ordinances is ' "the power of sovereignty or power to govern—the inherent reserved power of the state

10

to subject individual rights to reasonable regulation for the general welfare." [Citation.] The police power extends to legislative objectives in furtherance of public peace, safety, morals, health and welfare.' " (*Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1557.) "Under the police power . . . , [municipalities] have plenary authority to govern, subject only to the limitation that they exercise this power within their territorial limits and subordinate to state law. [Citation.] . . . [¶] If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void." (*Candid Enterprises, Inc. v. Grossmont Union High School Dist*. (1985) 39 Cal.3d 878, 885.) The local police power generally includes the power to adopt ordinances for aesthetic reasons. (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 886 [imposition of aesthetic permit conditions "have long been held to be valid exercises of the city's traditional police power"]; *Disney v. City of Concord* (2011) 194 Cal.App.4th 1410, 1416 ["settled . . . that cities can use their police power to adopt ordinances for aesthetic reasons"].)

Telegraph and telephone corporations have long been granted the right (franchise) to construct their lines along and upon public roads and highways throughout the state. (*Sunset Tel. and Tel. Co. v. Pasadena* (1911) 161 Cal. 265, 272–273 [discussing former Civ. Code, § 536]; *Pacific Telephone I, supra,* 51 Cal.2d at pp. 770–771.) That franchise, however, also has long been subject to regulation to ensure such lines do not "incommode" the public's use of those roads and highways. (Former Civ. Code, § 536, as amended by Stats. 1905, ch. 385, § 1, pp. 491–492; Stats. 1951, ch. 764, pp. 2025, 2194, 2258 [reenacting former Civ. Code, § 536 as Pub. Util. Code, § 7901].) Since 1951, section 7901 has provided: "Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, *in such manner and at such points as not to incommode the public use of the road* or highway or interrupt the navigation of the waters." (Italics added.) The Legislature later confirmed local government's "right to exercise reasonable control as to the time, place,

11

and manner in which roads, highways, and waterways are accessed" in its enactment of section 7901.1.  (§ 7901.1, subd. (a), added by Stats. 1995, ch. 968, § 1, p. 7388.)

The City concedes Plaintiffs are "telephone corporations" seeking to install "telephone lines" under section 7901.  (See §§ 233, 234; *City of Huntington Beach v. Public Utilities Com.* (2013) 214 Cal.App.4th 566, 587–588; *GTE Mobilenet of Cal. Ltd. v. City of San Francisco* (N.D.Cal. 2006) 440 F.Supp.2d 1097, 1103 ["wireless carriers are included in the definition of 'telephone corporation' in § 7901, and . . . the definition of 'telephone line' in § 7901 is broad enough to reach wireless equipment"].)  It is undisputed that local government cannot entirely bar a telephone corporation from installing its equipment in the public right-of-way.  (*Pacific Telephone I, supra*, 51 Cal.2d at p. 774.)  Furthermore, cities may not charge franchise fees to telephone corporations for the privilege of installing telephone lines in the public right-of-way.  (*Huntington Beach,* at p. 587.)  But section 7901 does not grant telephone corporations unlimited rights to install their equipment within the right-of-way.  Rather, section 7901 clearly states that such installations must not "incommode the public use of the road or highway or interrupt the navigation of the waters."  (§ 7901.)  Furthermore, "section 7901 grants [Plaintiffs] the privilege to construct infrastructure upon public rights-of-way, subject to a municipality's 'right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed.'  (§ 7901.1, subd. (a).)" (*Huntington Beach,* at p. 569, fn. omitted.)

In *Pacific Telephone I, supra,* 51 Cal.2d 766, our Supreme Court held the construction and maintenance of telephone lines in public streets is a matter of state concern, not a municipal affair, under article XI of the California Constitution.  (*Id.* at p. 768.)  It was, by then, "settled that [former] section 536 of the Civil Code constitutes 'a continuing offer extended to telephone and telegraph companies . . . which offer when accepted by the construction and maintenance of lines' [citation] gives a franchise from the state to use the public highways for the prescribed purposes without the necessity for any grant by a subordinate legislative body."  (*Id.* at p. 771.)  Accordingly, the City could not require the telephone company to obtain a separate local franchise (*ibid.*), in addition

12

to the state franchise, or in the absence of such a local franchise "exclude telephone lines from the streets upon the theory that 'it is a municipal affair' " (*id.* at p. 774).

Plaintiffs suggest the *Pacific Telephone I* holding is determinative and that, if the construction and maintenance of telephone lines is a statewide concern, localities may not regulate Plaintiffs' access to the right-of-way by requiring a discretionary permit. Plaintiffs read the opinion far too broadly. The *Pacific Telephone I* holding is a narrow one: cities cannot exclude telephone lines from the public right-of-way on the basis that no local franchise has been obtained.[11] Opinions are not authority for propositions not considered. (*People v. Avila* (2006) 38 Cal.4th 491, 566.) Importantly, in *Pacific Telephone I,* the telephone company conceded the City retained the power to require it to obtain permits before installation or excavation in the right-of-way. (*Pacific Telephone I, supra,* 51 Cal.2d at pp. 773–774.)

"The right of telephone corporations to construct telephone lines in public rights-of-way is not absolute. It has been observed by our Supreme Court that section 7901 grants 'a limited right to use the highways and [does so] only to the extent necessary for the furnishing of services to the public.' (*County of L. A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 387.) The text of section 7901 provides that telephone lines may not 'incommode the public use of the road or highway . . . .' (*Ibid.*) Section 7901.1 states '[i]t is the intent of the Legislature, consistent with Section 7901, that municipalities shall have the right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed.' (§ 7901.1, subd. (a).) 'The control, to be reasonable, shall, at a minimum, be applied to all entities in an equivalent manner.' (§ 7901.1, subd. (b).) [¶] In addition, section 2902 states that municipal corporations may

---

[11] *Sunset Tel. and Tel. Co. v. Pasadena, supra,* 161 Cal. 265 stands for a similarly narrow proposition. Plaintiffs also misplace their reliance on *In re Johnston* (1902) 137 Cal. 115, which is not on point. *Johnston* involved former section 19 of article XI of the California Constitution, which gave gas and water companies a franchise to install pipes in the right-of-way, limited only by " 'such general regulations as the municipality may prescribe for damages and indemnity for damages.' " (*Johnston*, at p. 119.)

not 'surrender to the [Public Utilities Commission] its powers of control to supervise and regulate the relationship between a public utility and the general public in matters affecting the health, convenience, and safety of the general public, including matters such as the use and repair of public streets by any public utility, the location of the poles, wires, mains, or conduits of any public utility, on, under, or above any public streets, and the speed of common carriers operating within the limits of the municipal corporation.' " (*City of Huntington Beach v. Public Utilities Com., supra,* 214 Cal.App.4th at pp. 590– 591.) Thus, "the Public Utilities Code specifically contemplates potential conflicts between the rights of telephone corporations to install telephone lines in the public right-of-way and the rights of cities to regulate local matters such as the location of poles and wires." (*Id.* at p. 591.)

Instead of preempting local regulation, the statutory scheme (§§ 2902, 7901, 7901.1) and the above authority suggest the Legislature intended the state franchise would coexist alongside local regulation. In arguing "[t]here is no meaningful difference between regulating entry in a blanket fashion versus regulating entry on a case-by-case basis," Plaintiffs seek to divert our attention from the only question before us. Case-by-case regulation is meaningfully different. Requiring a local franchise, as the City did in *Pacific Telephone I*, has the immediate effect of prohibiting the telephone corporations' use of the public right-of-way, whereas local regulation on a site-by-site basis does not have the same impact. As stated by Amici Curiae, the exercise of local planning discretion "is not used to prohibit the use of the public rights of way, or to abridge any state-conferred rights of [telephone corporations]. It is used to harmonize the interest and rights of [telephone corporations] with cities' and counties' other legitimate objectives . . . ." Plaintiffs cannot meet their burden on a facial challenge by suggesting the City may apply the Ordinance so as to prohibit their use of the right-of-way altogether. (*Arcadia Unified School Dist. v. State Dept. of Education, supra,* 2 Cal.4th at p. 267 [" '[t]o support a determination of facial unconstitutionality, voiding the statute as a whole, [plaintiffs] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the

14

statute' "].)  Plaintiffs have not met their burden to show local government can *never, in any situation*, exercise discretion to deny a permit for a particular proposed wireless facility.  Thus, we turn to Plaintiffs' second argument—that section 7901 implicitly prohibits *any* local government regulation of wireless facility aesthetics.

Plaintiffs appear to concede the Ordinance does not duplicate or contradict state law.  Instead, they appear to focus on whether the Ordinance has "manifested its intent to 'fully occupy' " any area of regulation exceeding that necessary to prevent physical obstruction of travel on the public right-of-way.  (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 898.)  Accordingly, the question is whether the Legislature impliedly preempted the City's power to condition approval of a Wireless Permit on aesthetics-based standards?  "The Legislature's 'preemptive action in specific and expressly limited areas weighs against an inference that preemption by implication was intended elsewhere.'  [Citations.]  In addition, . . . '[p]reemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations.  Similarly, it should not be found when the statutory scheme recognizes local regulations.' "  (*Big Creek Lumber Co. v. County of Santa Cruz, supra,* 38 Cal.4th at p. 1157.)

"In general, courts are cautious in applying the doctrine of implied preemption:  '[I]n view of the long tradition of local regulation and the legislatively imposed duty to preserve and protect the public health, preemption may not be lightly found.'  [Citation.]  Where local legislation clearly serves local purposes, and state legislation that appears to be in conflict actually serves different, statewide purposes, preemption will not be found."  (*San Diego Gas & Electric Co. v. City of Carlsbad, supra,* 64 Cal.App.4th at p. 793.)

The Ordinance unquestionably allows the City to condition approval of a particular Wireless Permit on aesthetic considerations.  Plaintiffs contend the Legislature impliedly preempted such local regulation by giving telephone corporations the power to install telephone lines in the public right-of-way "in such manner and at such points *as not to incommode the public use of the road* or highway or interrupt the navigation of the

15

waters." (§ 7901, italics added.)  Plaintiffs' position is that "incommode" means only physical obstruction of travel in the public right-of-way.  The City, on the other hand, points out that the dictionary definition of "incommode" is broader and includes "inconvenience, discomfort, and disturbance beyond mere blockage."  (See Merriam Webster Online Dictionary <http://www.merriam-webster.com/dictionary/incommode> [as of Sept. 15, 2016] [defining "incommode" as "to give inconvenience or distress to: disturb"]; Webster's Dictionary (1828) <http://webstersdictionary1828.com/Dictionary/ incommode> [as of Sept. 15, 2016] [defining "incommode" as "[t]o give inconvenience to; to give trouble to; to disturb or molest in the quiet enjoyment of something, or in the facility of acquisition"; denoting "less than annoy, vex or harass"; e.g., "We are incommoded by want of room to sit at ease"].)  We must construe the statute.

"The relevant principles that guide our decision are well known.  ' "Our function is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.]  To ascertain such intent, courts turn first to the words of the statute itself [citation], and seek to give the words employed by the Legislature their usual and ordinary meaning.  [Citation.]  When interpreting statutory language, we may neither insert language which has been omitted nor ignore language which has been inserted. (Code Civ. Proc., § 1858.)  The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute [citation], and where possible the language should be read so as to conform to the spirit of the enactment.  [Citation.]" '  [Citations.] [¶] We also must endeavor to harmonize, both internally and with each other, separate statutory provisions relating to the same subject." (*Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist., supra,* 90 Cal.App.4th at pp. 69–70.)  " ' "It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute."  A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.' " (*Rodriguez v. Superior Court* (1993) 14 Cal.App.4th 1260, 1269.)

16

"When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122.) "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . ." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) "When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008.) "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.) "The court will apply common sense to the language at hand and interpret the statute to make it workable and reasonable." (*Wasatch Property Management*, at p. 1122.)

In contending the trial court erred by adopting the broader interpretation of "incommode," Plaintiffs rely on *Western Union Tel. Co. v. Visalia* (1906) 149 Cal. 744, 750 (*Visalia*) and *Pacific Tel. & Tel. Co. v. City & County of San Francisco* (1961) 197 Cal.App.2d 133, 152 (*Pacific Telephone II*). In *Visalia,* a telegraph company challenged an assessment imposed on a purported local franchise to operate telegraph lines within the city of Visalia. (*Visalia*, at p. 745.) Our Supreme Court concluded there was no such local franchise because former Civil Code section 536 had already given the telegraph company "the right, of which the city could not deprive it, to construct and operate its lines along the streets of the city." (*Visalia*, at p. 750.) The court continued: "[N]evertheless [the telegraph company] could not maintain its poles and wires in such a manner as to unreasonably obstruct and interfere with ordinary travel; and the city had the authority, under its police power, to so regulate the manner of . . . placing and

17

maintaining its poles and wires as to prevent unreasonable obstruction of travel." (*Id.* at pp. 750–751.)

In *Pacific Telephone II, supra,* 197 Cal.App.2d 133, the City argued that the telephone company could not claim a franchise under former section 536 of the Civil Code without first proving that the construction and maintenance of its poles and lines in San Francisco streets would not "incommode" the public use thereof. (*Id.* at p. 145.) Division One of this court rejected the argument, reasoning that the City's interpretation of former Civil Code section 536 was too restrictive. "Obviously, the Legislature in adopting section 536 knew that the placing of poles, etc., in a street would of necessity constitute some incommodity to the public use, but *the restriction necessarily is limited to an unreasonable obstruction of the public use*. [¶] . . . [¶] It is absurd to contend that the installation of telephone poles and lines, *under the control by the city of their location and manner of construction,* is such an 'incommodation' as to make section 536 inapplicable. Such a construction of that section would make it completely inoperable." (*Pacific Telephone II*, at p. 146, italics added.)

Neither *Pacific Telephone II* nor *Visalia* considered the issue presented here—whether the aesthetic impacts of a particular telephone line installation could ever "incommode the public use." We decline Plaintiffs' invitation to consider the opinions as authority for propositions not considered. (*People v. Avila, supra,* 38 Cal.4th at p. 566.) In fact, the *Pacific Telephone II* court stated, "because of the state concern in communications, the state has retained to itself the broader police power of granting franchises, *leaving to the municipalities the narrower police power of controlling location and manner of installation.*" (*Pacific Telephone II, supra,* 197 Cal.App.2d at p. 152, italics added.) Thus, the case does not support Plaintiffs' position that section 7901 prohibits local government from considering aesthetics when issuing individual Wireless Permits. It simply leaves open the question—what kind of control over location and manner can local government exercise?

Although California courts have not yet addressed this precise issue in any published opinion, authority from the United States Court of Appeals for the Ninth

18

Circuit is directly on point. In *Palos Verdes Estates, supra,* 583 F.3d 716, the city of Palos Verdes Estates denied, for aesthetic reasons, two permits to construct wireless facilities in the public right-of-way. (*Id.* at p. 719.) A city ordinance authorized Palos Verdes Estates to deny such permit applications on aesthetic grounds. (*Id.* at pp. 720–721.)

When the telephone company challenged the permit denials, the *Palos Verdes Estates* court found no conflict between the city's consideration of aesthetics and section 7901. The key to that conclusion was the court's observation that article XI, section 7 of the California Constitution grants local government authority to regulate local aesthetics and "neither [section] 7901 nor [section] 7901.1 divests it of that authority." (*Palos Verdes Estates, supra,* 583 F.3d at pp. 721–722.) The court construed the statutory language, "to 'incommode' the public use," as meaning "to 'subject [it] to inconvenience or discomfort; to trouble, annoy, molest, embarrass, inconvenience' or '[t]o affect with inconvenience, to hinder, impede, obstruct (an action, etc.).' " (*Id.* at p. 723.) It also observed, " 'public use' of the rights-of-way is not limited to travel" and that "[i]t is a widely accepted principle of urban planning that streets may be employed to serve important social, expressive, and aesthetic functions." (*Ibid.*)

Likewise, section 7901.1 did not preempt the local ordinance, as it "was added . . . in 1995 to '*bolster* the cities' abilities with regard to construction management and to send a message to telephone corporations that cities have authority to manage their construction . . . .' " (*Palos Verdes Estates, supra,* 583 F.3d at p. 724, italics added, quoting Sen. Com. on Energy, Utilities, and Communications, Analysis of Sen. Bill No. 621 (1995–1996 Reg. Sess.).) "If the preexisting ['incommodation'] language of [section] 7901 did not divest cities of the authority to consider aesthetics in denying [wireless facility] construction permits, then, a fortiori, neither does the language of [section] 7901.1, which only 'bolsters' cities' control." (*Palos Verdes Estates, supra,* 583 F.3d at p. 724.) The court concluded, "there is no conflict between [the city's] consideration of aesthetics in deciding to deny a [wireless] permit" and sections 7901 and 7901.1. (*Palos Verdes Estates*, at p. 724.)

19

Three years earlier, another panel of the Ninth Circuit reached the opposite conclusion in an unpublished decision *Sprint PCS v. La Cañada Flintridge* (9th Cir. 2006) 182 Fed.Appx. 688, 689, 691 (*La Cañada Flintridge*).  The *La Cañada Flintridge* court rejected the dictionary definition of "incommode" and, instead, relied on *Pacific Telephone II*'s narrow construction of "incommode."  (*Id.* at pp. 690–691.)  The court determined the city could only prevent " 'unreasonable obstruction of the public use,' " because "[t]he text focuses on the function of the road—its 'use,' not its enjoyment. Based solely on § 7901, it is unlikely that local authorities could deny permits based on aesthetics without an independent justification rooted in interference with the function of the road."  (*Id.* at pp. 690–691.)

Plaintiffs ask us to rely on *La Cañada Flintridge,* contending that *Palos Verdes Estates* inadequately addresses California authority.  Plaintiffs' criticism is not well taken.  The *Palos Verdes Estates* court cites *Pacific Telephone I* for the proposition that a "telephone franchise is a matter of state concern but city still controls the particular location and manner in which public utility facilities are constructed in the streets." (*Palos Verdes Estates, supra,* 583 F.3d at pp. 722–723, fn. 3.)  We have already expressed our disagreement with Plaintiffs' broader reading of *Pacific Telephone I* and thus cannot fault the *Palos Verdes Estates* court for implicitly reaching the same conclusion or not discussing *Visalia, supra,* 149 Cal. 744, *In re Johnston, supra,* 137 Cal. 115, or *Sunset Tel. and Tel. Co. v. Pasadena, supra,* 161 Cal. 265.

Of course, we are not bound by the Ninth Circuit's opinion on matters of state law. (*Campbell v. Superior Court* (1996) 44 Cal.App.4th 1308, 1317.)  Although the *Palos Verdes Estates* opinion is not binding, we find it persuasive.  (*Adams v. Pacific Bell Directory* (2003) 111 Cal.App.4th 93, 97; *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 299.)  We agree with the City and the *Palos Verdes Estates* court that Plaintiffs' interpretation of "incommode" is too narrow and inconsistent with the term's plain meaning.  Plaintiffs' other textual arguments, grounded in *La Cañada Flintridge*, are no more convincing.  According to Plaintiffs, because the express language of section 7901 provides that telephone corporations may not install their equipment in a

20

location or manner that "incommode[s] the public *use* of the road or highway or *interrupt*[*s*] *the navigation* of the water," the Legislature must have intended "incommode" be limited to physical obstructions of travel.[12]  Plaintiffs' argument rests on the faulty assumption that "use" of a public road means nothing beyond transportation thereon.  We agree with the *Palos Verdes Estates* court that public use of the right-of-way is not limited to travel and that streets "may be employed to serve important social, expressive, and aesthetic functions."  (*Palos Verdes Estates, supra,* 583 F.3d at p. 723.)

We believe the *La Cañada Flintridge* court reached the wrong result through a cursory analysis, in which it interpreted "incommode" too narrowly and adopted a myopic view of the function of public roads.  (*La Cañada Flintridge, supra,* 182 Fed.Appx. at pp. 690–691.)  Furthermore, although we are not precluded from considering unpublished federal decisions, we note that even within the Ninth Circuit *La Cañada Flintridge* has no precedential value.  (*Bowen v. Ziasun Technologies, Inc.* (2004) 116 Cal.App.4th 777, 787, fn. 6; U.S. Cir. Ct. Rules (9th Cir.), rule 36-3(a) ["[u]npublished dispositions and orders of this Court are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion"].)

Nothing in section 7901 explicitly prohibits local government from conditioning the approval of a particular siting permit on aesthetic concerns.  In our view, "incommode the public use" means "to unreasonably subject the public use to inconvenience or

_____

[12] The Legislature's use of the terms "use" and "enjoyment" in other, unrelated provisions of state law does not convince us that the omission of the latter term here is significant.  (See *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 595 ["when ' " 'a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute *concerning a related matter* indicates an intent that the provision is not applicable to the statute from which it was omitted' " ' " (italics added)].)  Nor are we persuaded by Plaintiffs' reliance on out-of-state tort cases that involved liability related to a utility company's actual physical obstruction of public roads.  Neither these opinions, nor other inapposite out-of-state cases cited by Plaintiffs, address the question before us.  Nor do they suggest the meaning of "incommode" is limited to physical obstruction of travel.

21

discomfort; to unreasonably trouble, annoy, molest, embarrass, inconvenience; to unreasonably hinder, impede, or obstruct the public use." (See *Palos Verdes Estates, supra,* 583 F.3d at p. 723.)

We cannot agree with Plaintiffs that our construction of the term "incommode" is limitless and "effectively nullif[ies] the Section 7901 franchise." We can certainly imagine that a large wireless facility might aesthetically "incommode" the public use of the right-of-way, if installed very close to Coit Tower or the oft photographed "Painted Ladies," but present no similar "incommodation" in other parts of the urban landscape. Plaintiffs also argue: "Even if aesthetics were a theoretically proper basis for regulating the installation of telephone lines in the public rights of way under Section 7901, the City's treatment of other equipment in the public rights of way emphasizes that there are no legitimate grounds for claiming that wireless equipment may incommode the use of the public rights of way." Should Plaintiffs be denied a Wireless Permit in an area already cluttered with other electrical and telecommunications equipment, we again have no doubt they may pursue an as-applied challenge. Presented only with a facial challenge, we cannot assume the City will apply the Ordinance in this manner. (*Arcadia Unified School Dist. v. State Dept. of Education, supra,* 2 Cal.4th at p. 267.)

The trial court did not err in determining the Ordinance is not facially preempted by sections 7901 and section 7901.1.

B.  *Direct Conflict Preemption by Section 7901.1*

Plaintiffs also argue that the Ordinance directly conflicts with section 7901.1, subdivision (b), because the City "has singled out wireless equipment" by requiring providers of commercial mobile services alone to obtain site-specific permits while "ignoring the aesthetics of identical equipment installed by other right of way occupants." Plaintiffs assert the trial court's conclusion the Ordinance does not facially conflict with section 7901.1, subdivision (b), "is inconsistent with its [other] factual and legal holdings"—i.e., that other occupants' equipment is similar in size and appearance and that site-specific permitting requirements are not imposed on other occupants of the right-of-way.

Section 7901.1 provides: "(a) It is the intent of the Legislature, *consistent with Section 7901*, that municipalities shall have the right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways *are accessed*. [¶] (b) The control, to be reasonable, shall, at a minimum, *be applied to all entities in an equivalent manner*. [¶] (c) Nothing in this section shall add to or subtract from any existing authority with respect to the imposition of fees by municipalities." (Italics added.) Plaintiffs and the City agree that section 7901.1, subdivision (b), applies only to construction activities. They use the term in different senses, however.

The City maintains: "[T]he use of the phrase 'time, place, and manner in which the roads, highways, and waterways are *accessed*' clearly refers to local authority to control *temporary* uses of the public right-of-way during construction. This term implies that the legislature intended to make clear local governments could prevent incommodations both through section 7901 and by controlling the use of the public right-of-way during construction—even if the facilities once constructed (i.e., underground utility facilities) could not themselves incommode the public right-of-way." (Italics added.) In other words, "[t]he inquiry under section 7901 is whether, *once installed*, those facilities would 'incommode' the public right-of-way. Construction management regulations permitted under section 7901.1 . . . address *how* the applicant intends to install its facilities in the public right-of-way." Under the City's interpretation of section 7901.1, subdivision (b) of the statute has no application to the Ordinance because it is not a regulation of "time, place, and manner of *construction*—but is instead a regulation that permits Wireless Facilities to be installed in the public right-of-way subject to certain siting criteria." (Italics added.)

Plaintiffs, on the other hand, contend that section 7901.1 does not relate solely to temporary construction access to the right-of-way. Plaintiffs' position is that section 7901.1 "does not expand [local government] authority," but rather defines the limited authority section 7901 reserved for local governments to regulate how the public right-of-way is accessed *and* occupied. "In other words, Section 7901.1 tells us that the way local governments can enforce the limits of telephone corporations' statewide franchise rights

23

and ensure they do not 'incommode the public use' of the streets is to assert 'reasonable control' over the 'time, place, and manner' in which telephone corporations access the public rights of way." (Fn. omitted.) Plaintiffs maintain "[s]ection 7901 does not describe local authority, [s]ection 7901.1 does."

"Access" means "a way of getting near, at, or to something or someone"; "a way of being able to use or get something"; "permission or the right to enter, get near, or make use of something or to have contact with someone." (See Merriam Webster Online Dictionary <http://www.merriam-webster.com/dictionary/accessed> [as of Sept. 15, 2016].) Although the plain meaning of the word "accessed" is ambiguous, the remainder of section 7901.1 and its legislative history make clear the section is concerned solely with "temporary access" for construction purposes. (See *Palos Verdes Estates, supra,* 583 F.3d at pp. 724–725 [agreeing the Legislature's use of phrase "time, place and manner" in which rights-of-way "are accessed" "can refer only to when, where, and how telecommunications service providers gain entry to the public rights-of-way"].)

Enactment of section 7901.1 was premised on an understanding that the section 7901 franchise "provide[s] the telephone corporations with the right to *construct and maintain* their facilities. Local government has limited authority to manage or control that *construction*. [¶] . . . [¶] . . . This bill is intended to bolster the [cities'] abilities with regard to *construction management* and to send a message to telephone corporations that cities have authority to manage *their construction*, without jeopardizing the telephone corporations' statewide franchise." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 621 (1995–1996 Reg. Sess.) as amended May 3, 1995, pp. 1, 3, italics added.)

The legislative history of section 7901.1 also provides: "To encourage the statewide development of telephone service, telephone corporations have been given state franchises to build their networks. This facilitates construction by minimizing the ability of local government to regulate construction by telephone corporations. Only telephone companies have statewide franchises; energy utilities and cable television companies obtain local franchises. [¶] . . . [¶] Cities interpret their authority to manage telephone

24

company *construction* differently.  Telephone corporations represent their rights under state franchise differently as well, sometimes taking the extreme position that cities have absolutely no right to control *construction*.  This lack of clarity causes frequent disputes.  Among the complaints of the cities are a lack of ability to plan maintenance programs, protect public safety, minimize public inconvenience, and ensure adherence to sound construction practices.  Cities are further concerned that *multiple street cuts caused by uncoordinated construction* shortens the life of the streets, causing increased taxpayer costs, as described in a recently commissioned study."  (Assem. Com. on Utilities and Commerce, Rep. on Sen. Bill No. 621 (1995-1996 Reg. Sess.) as amended July 7, 1995, pp. 1–2, italics added.)

If we were to accept Plaintiffs' construction of section 7901.1, we would necessarily ignore this legislative history and, more importantly, eliminate the effect of section 7901.1's "consistent with section 7901" language.  Had the Legislature intended to narrow and restrict local government's existing authority under section 7901, we cannot imagine it would have included the "consistent with section 7901" language.  Nor would an enrolled bill report make clear that Senate Bill No. 621 "would not change current law, but would simply clarify existing municipality rights" and "reduce disputes between telephone companies and cities, as well as result in fewer inconveniences to citizens without infringing on the telephone companies['] right to construct and maintain their facilities."  (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Sen. Bill No. 621 (1995–1996 Reg. Sess.) Aug. 31, 1995, p. 3.)

We understand section 7901.1 as affirming and clarifying a subset of the local government powers, reserved under section 7901, to regulate telephone lines in the right-of-way.  Even if the meaning of "all entities" is not limited to telephone and telegraph corporations, Plaintiffs have not met their burden to show the Ordinance is preempted because section 7901.1 applies only to construction itself.  With respect to temporary access to the right-of-way for construction purposes, the record shows the City uniformly requires AT&T, Comcast, PG&E, and Plaintiffs to obtain temporary occupancy permits to access the right-of-way during construction.  Of course, if the Legislature disagrees

25

with our conclusions, or wishes to grant the wireless industry further relief from local regulation, it remains free to amend sections 7901 and 7901.1.

### III.    DISPOSITION

The judgment is affirmed.  The City is to recover its costs on appeal.


_____
BRUINIERS, J.


WE CONCUR:


_____
SIMONS, Acting P. J.


_____
NEEDHAM, J.

Superior Court of the City and County of San Francisco, No. CGC-11-510703, James McBride, Judge.

Davis Wright Tremaine, Martin L. Fineman, T. Scott Thompson and Daniel P. Reing for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Yvonne R. Meré, Chief of Complex and Affirmative Litigation, William K. Sanders and Erin B. Bernstein, Deputy City Attorneys, for Defendants and Respondents.

Rutan & Tucker, Jeffrey T. Melching and Ajit Singh Thind for League of California Cities, California State Association of Counties and SCAN NATOA, Inc. as Amici Curiae on behalf of Defendants and Respondents.